IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**THE OHIO BELL TELEPHONE CO., INC.,:**
:
**Plaintiff,** :
: Case No. C2-06-CV-549
v. :
: JUDGE ALGENON L. MARBLEY
**GLOBAL NAPS OHIO, INC., ET AL.,** :
: Magistrate Judge Kemp
**Defendant.** :

## OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on Plaintiff The Ohio Bell Company, Inc.'s Motion for Summary Judgment (Doc. 158) and Defendants Global NAPS Ohio, Inc., et al.'s Cross-Motion for Summary Judgment (Doc. 163). Because a variety of material factual issues remain, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part, and Defendants' Motion is **DENIED**.

### II. BACKGROUND

### A. FACTUAL BACKGROUND

Plaintiff The Ohio Bell Company, Inc. ("AT&T Ohio") engages in the telecommunications industry as an Incumbent Local Exchange Carrier ("ILEC"). Defendant Global NAPs Ohio, Inc. ("Global Ohio") does business as a Competitive Local Exchange Carrier ("CLEC"). Defendant Ferrous Miner Holdings, Ltd. ("Ferrous") is Global Ohio's parent company. The other Defendants – Global NAPs, Inc.; Global NAPs New Hampshire, Inc.; Global NAPs Networks, Inc.; and Global NAPs Realty, Inc. – are subsidiaries of Ferrous. It is

not disputed that Global Ohio has no employees, assets, or revenues of its own. Global Ohio, along with the other subsidiaries, has been categorized as a "paper" or "file" company, established only for purposes of meeting regulatory requirements for doing business in Ohio.

AT&T Ohio and Global Ohio do business pursuant to an interconnection agreement ("ICA") signed by both parties, and pursuant to AT&T Ohio's state and federal tariffs. The Telecommunications Act of 1996, 47 U.S.C. §§ 251 *et seq*., ("the Act") was designed to promote competition in the telecommunications industry. In an attempt to curb the sometime prohibitive costs of entry into the market, the Act requires ILECs, such as AT&T Ohio, to provide CLECs, such as Global Ohio, with access to their networks. This access is necessary to allow the CLEC's customers to send calls to and receive calls from customers of the ILEC.

The Act requires that, when a CLEC requests access to an ILEC's network, the parties negotiate and establish an ICA. The ICA sets for the terms, conditions, and pricing arrangements by which the communications traffic of the CLEC's customers will be transported over the ILEC's networks. The ICA may be established through voluntary negotiation, mediation, or compulsory arbitration conducted by a state commission, such as PUCO.[1] The Act

---

[1]The Seventh Circuit Court of Appeals further explained the relationship between ILECs and CLECs as follows:

> First, an "incumbent local exchange carrier" (a carrier that provided local phone services when the Act was passed, such as Illinois Bell) is required to interconnect on demand with other carriers that provide local telecommunications services within its service area. A carrier demanding interconnection must negotiate with the incumbent local exchange carrier on price and other terms. If the two carriers cannot reach agreement, their disagreement is submitted to what is called "arbitration," but is really the first state in a regulatory proceeding, as the "arbitration" decision must be submitted to the state regulatory commission for its approval, as must an agreement reached by negotiation.

mandates that, unless the parties have otherwise agreed, rates under the ICA "shall be based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection." 47 U.S.C. § 252(d)(1)(A).

Pursuant to the ICA and AT&T Ohio's state and federal tariffs, AT&T Ohio provided several services to Global Ohio. The ICA specified that the parties were responsible for establishing an SS7 connection through which telecommunications would be transmitted. Global Ohio requested two signals and links for that purpose, and AT&T Ohio provided them. In addition, AT&T Ohio provided terminating services to Global Ohio, allowing Global Ohio to transmit telecommunications to AT&T Ohio customers. Global Ohio never compensated AT&T Ohio for provision of the links and services, nor did Global Ohio compensate AT&T Ohio for the terminating services. Global contends that it is not required to compensate AT&T Ohio for either service.

AT&T Ohio also provided number portability queries to Global Ohio so that Global Ohio would be able to properly locate and deliver telecommunications to users who had switched carriers but retained the same phone number. Global Ohio never compensated AT&T Ohio for those services, and now contends that it is not required to.

## B. PROCEDURAL BACKGROUND

AT&T Ohio originally filed its complaint against Global Ohio in 2006, alleging that Global Ohio had failed to pay for services provided by AT&T Ohio. (Doc. 2). AT&T Ohio later amended its complaint to add the other defendants: Ferrous Miner Holdings, Ltd. ("Ferrous") – Global Ohio's parent company – as well as other subsidiaries of Ferrous, including Global

---

*Ill. Bell Tel. Co. v. Global NAPs Ill., Inc.*, 551 F.3d 587, 591 (7th Cir. 2008).

NAPs, Inc., Global NAPs New Hampshire, Inc., Global NAPs Networks, Inc., and Global NAPs Realty, Inc. (Doc. 14). Those additional defendants were added because AT&T Ohio alleged that they were liable for Global Ohio's debts as alter egos of Global Ohio. AT&T Ohio's original complaint alleged that Global Ohio had violated AT&T Ohio's federal and state tariffs, as well as the interconnection agreement that had been signed by both Global Ohio and AT&T Ohio. Defendants filed a Motion to Dismiss for Lack of Jurisdiction (Doc. 61), alleging that because AT&T Ohio had not first submitted its claims to the Public Utilities Commission of Ohio ("PUCO"), the Court did not have jurisdiction over the claims. In addition, Defendants alleged that AT&T Ohio's federal and state tariff claims should also be dismissed because they were simply claims for breach of the ICA, disguised as tariff claims. Finally, Defendants alleged that this Court lacked jurisdiction over AT&T Ohio's remaining quantum meruit claim because the federal question raised by the other claims no longer gave the Court subject matter jurisdiction. This Court granted the motion with respect to AT&T Ohio's breach of ICA claims, but denied it in all other respects.

Meanwhile, a similar case, *Ill. Bell v. Global NAPs Illinois* ("the Illinois case"), proceeded in the Northern District of Illinois. This Court set the trial in this case to begin the Monday following a jury verdict in the Illinois case.[2] AT&T Ohio then filed the instant Motion for Summary Judgment, and Defendants responded by filing a Cross-Motion for Summary Judgment. Oral argument on both parties' motions was held on February 19, 2010.

---

[2]There are actually two cases happening in Illinois, much like there are two cases happening here – one in front of a district court, and one in front of the state commission. The case in the Northern District of Illinois is currently awaiting a decision from the Illinois Commerce Commission.

## III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(C). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. But the non-moving party "may not rest merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When ruling on a motion for summary judgment, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, the Court may rely on the evidence called to its attention by the parties. *Id*.

## IV. ANALYSIS

### A. VOICE OVER INTERNET PROTOCOL CONFLICT

Global Ohio contends that most, if not all, of the traffic it transmitted to AT&T Ohio consisted of Voice over Internet Protocol ("VoIP") traffic. Global Ohio further contends that such traffic is not subject to state or federal tariffs, and is also not covered by the ICA. Essentially, Global Ohio's position is that it should not have to compensate AT&T Ohio for any services AT&T Ohio provided, because any such services related to Global Ohio's carrying of VoIP traffic, and AT&T Ohio is forbidden from charging Global Ohio (pursuant either to AT&T Ohio's state and federal tariffs, or the ICA) for any services related to VoIP traffic. AT&T Ohio, on the other hand, contends that little if any of Global Ohio's traffic was VoIP, and that, even if all of the traffic were VoIP, Global Ohio is still obligated to compensate AT&T Ohio pursuant to both AT&T Ohio's tariffs and the ICA.

As an threshold matter, the Court notes that, taken to its logical conclusion, Global Ohio's argument is a circular one. Global Ohio contends, in the first instance, that AT&T Ohio's tariffs cannot establish the compensation rate because the ICA controls, and the ICA cannot be superseded by tariffs.[3] The next step in Global Ohio's logic is that the ICA does not allow AT&T Ohio to charge Global Ohio for its services, because the ICA does not provide for compensation for services related to VoIP traffic, and all of Global Ohio's traffic was VoIP. Essentially, then, Global Ohio contends that the ICA – the document that both parties agree governs their relationship – does not address the only type of traffic involved in the parties'

---

[3]The Seventh Circuit recognized telecommunications carriers' authority "to make binding interconnection agreements setting forth the prices of the services agreed upon," rather than relying on tariffs to set all rates. *Ill. Bell*, 551 F.3d at 593 (citing 47 U.S.C. § 252(a)(1)).

relationship. The existence of the ICA, however, prevents AT&T Ohio from charging for its services based upon its valid state and federal tariffs. The Court cannot accept the proposition that AT&T Ohio is barred from any compensation for its services based solely on the fact that it entered into an agreement that did not address the services for which it should be compensated.

Despite the circularity of Global Ohio's logic, there remains a question regarding whether any or all of the traffic carried by Global Ohio and transmitted to AT&T Ohio was VoIP traffic. That remaining factual question is material, and summary judgment is, therefore, inappropriate. The Court will nonetheless address each claim in the Amended Complaint and explain why neither party is entitled to summary judgment on each claim.

## B. TERMINATING ACCESS CHARGES

Counts II and IV of the Amended Complaint involve charges levied by AT&T Ohio on Global Ohio for providing terminating services. Local carriers are required to provide long-distance carries with access to their local networks, both for call origination and call termination, so that an end-user is able to make and to receive long-distance calls using the telephone line provided by his or her local service provider. Long-distance carriers are required to pay local carriers access charges in order to access the local networks.[4]

---

[4]The D.C. Circuit has explained the system as follows:

> Long-distance telephone carriers (also called "interexchange carriers" or "IXCs") generally do not directly connect to their telephone customers. Rather, long-distance telephone traffic is ordinarily transmitted by a local exchange carrier (also called a "LEC") from its originating customer to an IXC. Then the "IXC carriers the traffic to its region of destination and hands it off to the LEC there." For example, if a customer in Washington, D.C., who subscribes to Verizon for local service and AT&T for long-distance service, calls a relative in Florida, who subscribes to Bellsouth for local service, the call initially will travel over Verizon's facilities.

In this case, Global Ohio, as a long-distance carrier, accessed AT&T Ohio's local network to terminate calls in Ohio. It is undisputed that AT&T Ohio billed Global Ohio for those terminating services, and that Global Ohio never paid AT&T Ohio. The dispute lies in the rate which Global Ohio was required to pay for those services.

AT&T Ohio contends that the ICA is silent as to terminating charges, and that AT&T Ohio's federal and state tariffs therefore establish the rate. Because AT&T Ohio billed Global Ohio pursuant to the rates established by the federal and state tariffs, AT&T Ohio asserts that it is entitled to summary judgment on Counts II and IV of the Amended Complaint.

Global Ohio, on the other hand, contends that it transmits VoIP traffic, that VoIP traffic is not subject to switched access charges, and that tariffs do not apply to VoIP traffic. Therefore, according to Global Ohio's argument, AT&T Ohio is unable to establish that the bills it submitted to Global Ohio were correct, and Global Ohio is entitled to summary judgment on Counts II and IV of the Amended Complaint.

The parties' disagreement on this counts centers around the factual issue regarding the type of traffic Global Ohio carries. If some or all of the traffic is *not* VoIP, a factual question exists regarding what type of traffic it is, and how the ICA contemplates that it be treated. For example, the Reciprocal Compensation Appendix ("RCA") clearly states that Exchange Access and intraLATA Toll traffic is governed by the appropriate federal and state tariffs. (RCA at 6.)

---

> Verizon will hand off the call to AT&T's facilities, which will carry the call to Florida before handing it off to BellSouth's facilities for delivery to the caller's relative. AT&T will charge the caller for the telephone call, and will pay "originating" access charges to Verizon and "terminating" access charges to BellSouth.

*AT&T Corp. v. F.C.C.*, 292 F.3d 808, 809 (D.C. Cir. 2002).

Similarly, the RCA states that intrastate intraLATA Toll traffic is governed by the Intrastate Access Service Tariff.[5] (RCA at 13.) If some or all of the traffic *is* VoIP, the ICA explicitly states that the parties have not agreed as to whether such traffic should be considered "local traffic subject to reciprocal compensation." (RCA at 17.) AT&T Ohio contends that this provision of the ICA is irrelevant because neither party is advocating that the traffic at issue be considered "local" traffic – AT&T Ohio billed the traffic as intraLATA and interLATA traffic, and Global Ohio has asserted that all of its traffic is interstate. Global Ohio, on the other hand, contends that this provision indicates that the parties never reached an agreement as to how to treat VoIP traffic. The importance of this section of the ICA hinges on whether or not any or all of the traffic at issue was VoIP – a material issue of fact that remains.

Classification of the traffic carried by Global Ohio and transmitted to AT&T Ohio for termination is essential to determine how the parties intended that traffic to be treated and what rate the parties intended to apply to the termination of that traffic. This confusion over classification of the traffic is exacerbated by the fact that the parties cannot even agree on the *plausible* classifications of the traffic. AT&T Ohio asserts that, pursuant to section 3.1 of the RCA, the traffic must be classified as either Local Calls, Transit Traffic, Optional Calling Area Traffic, IntraLATA Toll Traffic, or InterLATA Toll Traffic. Global Ohio, in contrast, claims that this list is non-exhaustive, and that rates are not limited to those five types of traffic. Given the factual disagreement regarding classification of the traffic and how that traffic should be

---

[5]The Court notes that, while Global Ohio's position that tariffs may not supersede specific terms in the ICA, the ICA explicitly references various state and federal tariffs. Application of those tariffs can therefore not be said to "supercede" the ICA, as they are applied *pursuant to* the ICA itself. The Court therefore rejects the argument that none of AT&T Ohio's tariffs can be applied to any traffic transmitted in this case.

9

priced, neither party is entitled to summary judgment on AT&T Ohio's claims for terminating access charges.

## C. LINK & CIRCUIT CHARGES

Counts I and V of the Amended Complaint involve four Access Service Requests ("ASRs") made by Global Ohio to AT&T Ohio. In addition to interconnecting network facilities described above, carriers exchanging calls must arrange for the transmission of signaling information (messages associated with calls carried over separate signaling links, allowing switches to communicate to determine how to route particular calls). Specifically, each ILEC is required by law:

> to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network: (A) for the transmission and routing of telephone exchange service and exchange access; (B) at any technically feasible point within the carrier's network; (C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and (D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.

42 U.S.C. § 251(c)(2). The signaling system used is referred to as the "SS7" system. In addition to the general requirement imposed by the Act that an ILEC provide interconnection with its network, the ICA explicitly states that the parties are required to use SS7 signaling to interconnect their networks; that if such connection is done through a third party, the connection is governed by the parties' tariffs; and that if such connection is done directly, the connection is governed by the SS7 Appendix. No SS7 Appendix was created or included as part of the ICA.

Global Ohio requested, and AT&T Ohio provided, two signaling links and two circuits to carry those signaling links. There is no dispute that AT&T Ohio provided the links and circuits

10

requested, and billed Global Ohio pursuant to AT&T Ohio's state and federal tariffs. There is also no dispute that Global Ohio never paid AT&T Ohio for the links and circuits. Finally, there is no dispute regarding[6] the fact that the ICA explicitly states that the parties are required to use SS7 signaling to interconnect their networks; that if such connection is done through a third party, the connection is governed by the parties' tariffs; that if such connection is done directly, the connection is governed by the SS7 Appendix; and that no SS7 Appendix was created or included as part of the ICA.

AT&T Ohio contends that the SS7 connection was established through a third party (namely, one of the other Global NAPs affiliates), because Global Ohio admitted that it had no equipment. In the alternative, AT&T Ohio argues that if the SS7 connection were to be considered established directly, the parties failed to include an SS7 Appendix, and therefore the tariff rate should apply. In response, Global Ohio contends that the connection was established by AT&T Ohio itself, which cannot be considered a third party, and that as a result, the non-existent SS7 Appendix controls, barring application of AT&T Ohio's tariff rates to the SS7 connection. Again, Global Ohio seems to be making a circular argument: the tariff rates cannot be imposed because the ICA controls, but the ICA Appendix that should control does not exist;

---

[6]Section 37.1 of the General Terms and Conditions of the ICA states, in relevant part:

> Each party may establish CCS interconnections either directly and/or through a Third Party. If CCS interconnection is established through a Third Party, the rates, terms, and conditions of the Parties' respective tariffs will apply. If CCS interconnection is established directly between CLEC and [AT&T Ohio], the rates, terms, and conditions of Appendix SS7 will apply.

ICA at 89.

therefore, Global Ohio is not obligated to compensate AT&T Ohio for the services it provided. The Court cannot accept this argument.

In the first instance, a factual issue remains regarding how the SS7 connection was established. If the connection was established directly, another factual issue remains regarding how the parties intended compensation for the connection to occur, given that they explicitly stated the rate would be determined by the SS7 Appendix, and then failed to include it. Given these material factual issues, summary judgment is not appropriate for either party.

## D. LOCAL PORTABILITY QUERY CHARGES

In Count III of the Amended Complaint, AT&T Ohio alleges that Global Ohio has violated AT&T Ohio's federal tariff by failing to pay tariffed rates for local number portability queries performed by AT&T Ohio on behalf of Global Ohio. The Act requires that local exchange carriers provide "number portability," or "the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another." 47 U.S.C. § 153(46).[7] In order to provide number portability, the FCC mandated creation of regional number portability databases. These databases store information regarding telephone numbers that have been "ported" from one carrier to another. To ensure proper termination of calls, carriers are required to query the regional databases to determine whether, and if so to where, a telephone number has been ported. Where a call is transferred to

---

[7]In other words, when a Verizon customer leaves Verizon and becomes an AT&T customer, the customer is entitled to carry his or her phone number from Verizon to AT&T without issue.

12

an ILEC (like AT&T Ohio), the ILEC must perform the query, and the carrier that transferred the call to the ILEC must compensate the ILEC for the query.

AT&T Ohio contends that Global Ohio is required to pay for these number portability charges pursuant to AT&T Ohio's state and federal tariffs. Global Ohio counters that the ICA prohibits AT&T Ohio from charging tariff rates for those queries.

The Number Portability Appendix ("NPA") to the ICA specifically states that "[t]he prices at which [AT&T Ohio] agrees to provide [Global Ohio] with Numbering Portability are contained in the applicable FCC tariff." (NPA at 4.) In addition, the NPA indicates that Permanent Number Portability queries will be priced as listed in "Section 6 of the FCC No. 2 Access Services Tariff." (NPA at 12.) Global Ohio contends that the entire NPA is inapplicable to the services exchanged by AT&T Ohio and Global Ohio, drawing a distinction between "number portability" and "number portability queries," and arguing that the NPA covers the former, but not the latter. Again, Global Ohio makes the argument that the ICA prevents application of tariff rates, but the ICA does not cover the services actually provided.

It is not clear to the Court whether there actually is a distinction between "number portability" and "number portability queries," and if so, whether the parties intended for the provisions of the NPA covering "number portability" to also cover "number portability queries." AT&T Ohio asserts that it believes the NPA applied to the number portability queries it performed for Global Ohio. In its papers, Global Ohio contends that the parties purposefully omitted number portability queries from the NPA. However, when questioned at oral argument, Global Ohio stated that the parties did *not* omit number portability queries, but that if they are liable to pay for those services, AT&T Ohio needs to bring a breach of contract claim to recover

13

payment, not the tariff claims currently before the court. Where ambiguity exists in the language of a contract, the question of "the meaning of the words used becomes one of fact." *Ohio Historical Soc. v. Gen. Maint. & Eng'r Co.*, 583 N.E.2d 340, 344 (Ohio App. 10 Dist. 1989). Here, the "number portability" language is ambiguous – it is not clear whether or not it includes "number portability queries." As a result, a genuine issue of material fact remains, and neither party is entitled to summary judgment on the number portability claims.

### E. QUANTUM MERUIT

Count IX of the Amended Complaint contains a quantum meruit claim. AT&T Ohio contends that, even if neither its state and federal tariffs nor the ICA require Global Ohio to compensate AT&T Ohio for services provided, Global Ohio should nonetheless be required to pay for those services to avoid unjust enrichment. In response, Global Ohio argues that AT&T Ohio's claim is barred both because quasi-contract recovery is unavailable where an express contract exists, and because the filed rate doctrine prohibits judicial rate-setting.

Global Ohio's contention that AT&T Ohio's quantum meruit claim fails as a matter of law due to the existence of an express contract is unpersuasive. AT&T Ohio pleaded its quantum meruit claim in the alternative; that is, if the Court should find that neither the ICA nor AT&T Ohio's tariffs govern the services AT&T Ohio has provided to Global Ohio, then AT&T Ohio believes the Court should grant it relief to prevent unjust enrichment to Global Ohio. Pleading in the alternative is an acceptable strategy. *See* Fed. R. Civ. P. 8(d)(2) & (3).

Global Ohio also contends that AT&T Ohio's quantum meruit claim fails as a matter of law due to the filed-rate doctrine. Global Ohio has not provided, and this Court is not aware of, any authority within the Sixth Circuit holding that the filed-rate doctrine bars quantum meruit

claims. Global Ohio does provide some authority from other circuits (mostly unpublished district court opinions) indicating the existence of such a rule. In *Union Tele. Co. V. Qwest Corp.*, 495 F.3d 1187, 1193 (10th Cir. 2007), the Tenth Circuit held that deviation from the rate filed by a carrier (pursuant to a tariff) was not permitted. That case is distinguishable, however, because AT&T Ohio is not asking the Court to deviate from its filed tariff rates; in fact, AT&T Ohio is asking the court to *apply the tariff rates*. As a result, any authority stating that equitable relief is not permitted where it would cause a rate other than the filed rate to be applied is inapplicable to this case.

Because neither of Global Ohio's bases for barring AT&T Ohio's quantum meruit claim is valid, AT&T Ohio is permitted to pursue that claim. The claim, however, is contingent upon resolution of the questions regarding the application of the ICA and AT&T Ohio's state and federal tariff rates. Because factual issues remain regarding whether and how the ICA and tariffs apply, summary judgment on the quantum meruit claim is not appropriate.

## F. PIERCING THE VEIL

AT&T Ohio claims that, should the Court find that Global Ohio is required to compensate AT&T for services rendered, the Court should pierce the corporate veil between Global Ohio and its parent corporation, Ferrous. Global Ohio contends that Delaware veil-piercing law applies, and that AT&T Ohio is unable to establish the element of fraud required to pierce the corporate veil under Delaware law.

The Seventh Circuit considered the question of what veil-piercing law to apply in the Illinois case. There, the court noted that federal veil-piercing law is sometimes appropriate because "a state's restrictive law of veil piercing is not allowed to undermine the effectiveness of

15

a federal statute that provides remedies for persons who may find it impossible to vindicate their federal rights if opposed by such a law." *Ill. Bell*, 551 F.3d at 598. The court doubted, however, "that there will be any need in this case to depart from the Delaware standard." *Id*. This Court agrees with and adopts the reasoning of the Seventh Circuit in *Illinois Bell* and finds that Delaware veil-piercing law applies.

Global Ohio contends that, under Delaware law, a plaintiff must make a showing of fraud in order to pierce the corporate veil, and that AT&T has been unable to do so in this case. The Seventh Circuit considered and rejected an identical argument from the defendants in the Illinois case. *See id*. at 597 (rejecting the fraud requirement because such a rule "would enable companies to insulate themselves from tort liability by operating shell corporations" and noting that "if you are a bystander injured by a truck driven by the employee of a corporation that has no assets, you cannot cry 'fraud' – the corporation had made no representations to you"). The Seventh Circuit went on to conclude that "in a contractual veil-piercing case . . . Delaware permits piercing the veil only upon proof either of fraud *or that the corporation simply functioned as a façade for the dominant shareholder*." *Id*. (emphasis added). AT&T Ohio attempts to pierce under the latter theory, and it has successfully determined that Global Ohio was indeed merely a façade for Ferrous.[8]

Global Ohio has admitted that it has no employees, equipment, assets, customers, or revenues. In addition, Global Ohio has admitted that it does not maintain any financial

---

[8]The Court recognizes that the Seventh Circuit did not actually determine whether Illinois Bell was entitled to pierce the corporate veil in the Illinois case, but was instead simply determining whether the possibility of veil piercing brought Ferrous within the personal jurisdiction of Illinois federal courts. However, the Court finds that the Seventh Circuit's analysis provides useful guidance in determining whether AT&T Ohio is entitled to pierce the veil in this case.

statements, and Richard Gangi, the Treasurer of Global Ohio and other Ferrous subsidiaries, stated during his deposition that while he was unsure whether Global Ohio maintained any financial statements and had never seen any such statements, he knew that Ferrous maintained those records. (R. Gangi Dep. at 35-36.) In addition, Mr. Gangi referred to Global Ohio and other subsidiaries as "file companies," admitting that those companies "don't actually do anything," but "are filed just for regulatory reasons." (*Id*. at 44.) Frank Gangi, the President of Global Ohio and other subsidiaries and the sole shareholder, officer, and director of Ferrous, admitted that he is "the President of probably two hundred corporations set up by [Ferrous's] counsel," and that some of those corporations "may be just what we call a file drawer company." (F. Gangi Dep. at 116-19.). As the Seventh Circuit observed with respect to Global Illinois's relationship to Ferrous, "[t]he corporate structure that the Gangi brothers have created appears to be designed to keep all its assets in corporations that have no liabilities and all its liabilities in corporations that have no assets." *Ill. Bell*, 551 F.3d at 597. Because AT&T Ohio has established that it was misled by Global Ohio's appearance as a legitimate corporation, it is entitled to pierce the corporate veil. *See id*. at 598-99. AT&T Ohio's Motion for Summary Judgment will therefore be granted with respect to its veil-piercing claims.

## V. CONCLUSION

With the exception of AT&T Ohio's veil-piercing theory of liability, significant factual issues remain. Therefore, Plaintiff's Motion is **GRANTED** with respect to piercing the corporation veil, and **DENIED** in all other aspects, and Defendants' Motion is **DENIED**.

**IT IS SO ORDERED**.

                                           **/s Algenon L. Marbley**
                                           **Algenon L. Marbley**
                                           **United States District Judge**

**Dated: March 15, 2010**